# EXHIBIT A

| | |
|---|---|
| 1 | PAULA M. YOST (State Bar No. 156843) |
| 2 | SANFORD KINGSLEY (State Bar No. 99849)<br>JEFFRY BUTLER (State Bar No. 180936) |
| 3 | SONNENSCHEIN NATH & ROSENTHAL LLP<br>525 Market Street, 26th Floor |
| 4 | San Francisco, California 94105-2708<br>Telephone: (415) 882-5000 |
| 5 | Facsimile: (415) 882-0300 |
| 6 | MICHAEL L. BOLI (State Bar No. 87937)<br>LAW OFFICE OF MICHAEL L. BOLI |
| 7 | 1501 37th Avenue, Suite G<br>Oakland, California 94601 |
| 8 | Telephone: (510) 535-9001<br>Facsimile: (510) 225-4005 |

**FILED**
**YOLO SUPERIOR COURT**

**OCT 0 9 2007**

BY _____ **E. ENDO** _____
DEPUTY

9  Attorneys for Plaintiffs
   RUMSEY INDIAN RANCHERIA OF WINTUN INDIANS OF
10  CALIFORNIA; RUMSEY GOVERNMENT PROPERTY FUND I, LLC;
    RUMSEY DEVELOPMENT CORPORATION; RUMSEY TRIBAL
11  DEVELOPMENT CORPORATION; RUMSEY MANAGEMENT
    GROUP; AND RUMSEY AUTOMOTIVE GROUP

12             SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                    FOR THE COUNTY OF YOLO

| | |
|---|---|
| 14 | RUMSEY INDIAN RANCHERIA OF<br>WINTUN INDIANS OF CALIFORNIA;<br>RUMSEY GOVERNMENT PROPERTY<br>FUND I, LLC; RUMSEY<br>DEVELOPMENT CORPORATION;<br>RUMSEY TRIBAL DEVELOPMENT<br>CORPORATION; RUMSEY<br>MANAGEMENT GROUP; AND<br>RUMSEY AUTOMOTIVE GROUP,<br><br>Plaintiffs,<br><br>vs.<br><br>HOWARD DICKSTEIN; JANE G. ZERBI;<br>DICKSTEIN & ZERBI; DICKSTEIN &<br>MERIN; ARLEN OPPER; OPPER<br>DEVELOPMENT, LLC; METRO V<br>PROPERTY MANAGEMENT<br>COMPANY; CAPITAL CASINO<br>PARTNERS I; MARK FRIEDMAN;<br>FULCRUM MANAGEMENT GROUP<br>LLC; FULCRUM FRIEDMAN<br>MANAGEMENT GROUP LLC,<br>DBA FULCRUM MANAGEMENT<br>GROUP LLC; ILLINOIS PROPERTY<br>FUND I CORPORATION, ILLINOIS<br>PROPERTY FUND II CORPORATION,<br>ILLINOIS PROPERTY FUND III<br>CORPORATION; 4330 WATT AVENUE,<br>LLC; AND DOES 1-100,<br><br>Defendants. | Case No. CV 07-2200<br><br>**COMPLAINT FOR:**<br>(1) **BREACH OF CONTRACT**<br>(2) **BREACH OF CONTRACT**<br>(3) **NEGLIGENCE**<br>(4) **BREACH OF FIDUCIARY DUTY**<br>(5) **AIDING AND ABETTING AND<br>     PARTICIPATING IN BREACHES<br>     OF FIDUCIARY DUTY**<br>(6) **FRAUD/CONCEALMENT**<br>(7) **CONSTRUCTIVE FRAUD**<br>(8) **NEGLIGENT<br>     MISREPRESENTATION**<br>(9) **CONVERSION**<br>(10) **VIOLATION OF BUSINESS &<br>     PROFESSIONS CODE<br>     SECTION 17200**<br>(11) **UNJUST ENRICHMENT**<br>(12) **DECLARATORY RELIEF**<br>(13) **NEGLIGENCE**<br>(14) **CIVIL CONSPIRACY** |

## I.   FACTUAL BACKGROUND

1.      This lawsuit is about greed and betrayal.  The Rumsey Band of Wintun Indians ("Tribe" or "Rumsey"), a sovereign Indian tribe whose reservation is located in the Capay Valley near Brooks, California, has discovered that its long-time (and now former) legal counsel and financial advisor breached their trust obligations and violated duties of the most basic and, indeed, sacred, kind.

2.      Specifically, and as the Tribe would learn after terminating its attorneys and financial consultant, the Tribe's former General Counsel, Howard L. Dickstein ("Dickstein"), and financial advisor, Arlen Opper ("Opper"), placed their own interests, and the interests of others, ahead of the Tribe's.  They did so, notwithstanding their positions of trust and confidence, and duties of undivided loyalty and fidelity owed the Tribe, in order to enrich themselves, or others, at the Tribe's expense.  For example, they repeatedly involved the Tribe in complicated investments or transactions in which the business terms were more favorable to others than they were to the Tribe.  Many such deals were fraught with self-dealing and conflicts of interest they failed to disclose.  In addition, Dickstein and Opper used (or allowed others to use) Tribal assets for personal purposes without reimbursement, and they failed to advise the Tribe's governing body, the Tribal Council, of the full extent of their compensation, even when specifically asked.  In the final analysis, the Tribe's former trusted counsel and investment advisor literally fed off the Tribe's financial success, or allowed others to do so, without the Tribal Council's knowledge and approval.

3.      The Tribe discovered these transgressions after hiring an investigative firm, Kroll Associates, Inc. ("Kroll"), to investigate the Tribe's business affairs.  The Tribal Council members sought the investigation after their election just months before, at the suggestion of another Tribal leader and friend of the Tribal Chairman.  The Tribal Council had encountered difficulty in securing basic financial information they had requested from Dickstein and Opper. Indeed, Dickstein initially refused to provide the Tribe's documents to Kroll, though he knew the Tribal Council had retained Kroll for this purpose.  He ultimately produced some, but not all,

1   requested documents. Kroll presented its preliminary findings to the Tribal Council, which

2   included, among other things, that:

3          (a)   The Tribe did not possess many of its own documents, including

4   partnership agreements, bank statements and legal documents; instead, such documents were

5   within the exclusive control of third parties, primarily Dickstein, Opper, and an outside

6   accountant, Boler & Associates ("Boler");

7          (b)   With the exception of the Tribe's primary business (Cache Creek Casino

8   Resort (the "Casino")), the Tribe's operations lacked internal controls, proper oversight, and any

9   policies and procedures, including, but not limited to, policies and procedures concerning the

10   handling of money;

11          (c)   The control of many of the Tribe's assets, and the decision-making with

12   respect to the use of those assets, rested almost exclusively with the Tribe's advisors, as opposed

13   to the Tribe itself. As an example, Dickstein completely controlled the use of the airplanes for

14   which the Tribe had purchased rights of use (Tribal members could only book flights through

15   Dickstein's office), and he controlled the use of a loft the Tribe maintained in Sacramento

16   (Tribal members could only secure use of the loft through Dickstein, who had the key);

17          (d)   Opper received compensation from, and/or equity interests in, the Tribe's

18   investments, conflicts of interest of which the Tribe was unaware;

19          (e)   Dickstein was to receive compensation from one of the Tribe's investments

20   and represented multiple clients in the Tribe's deals, conflicts of interest of which the Tribe was

21   unaware;

22          (f)   Dickstein and Opper used the Tribe's airplanes for personal trips (including

23   a $224,000 trip to France by Dickstein), and then failed to appropriately reimburse the Tribe for

24   such expenses;

25          (g)   Dickstein's law firm maintained a client trust account through which it

26   funneled significant amounts of the Tribe's money each year. At Dickstein's request, checks

27   were issued to the account, over which the Tribe had no oversight or approval authority;

28

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF., 94105-2708
(415) 882-

(h)   The compensation Dickstein and Opper actually received was significantly higher than what they disclosed to the Tribal Council.

4.   After Kroll presented its initial findings, the Tribal Council voted to terminate Dickstein and Opper. Thereafter, the Tribe continued the investigation, only to find that the questionable actions by Dickstein and Opper initially discovered by Kroll were even more widespread and disturbing.

5.   As the broader investigation revealed, Dickstein and Opper advised the Tribe to invest in multiple deals without fully explaining the terms of those deals, the parties to the transactions, their respective roles and interests, and the compensation each would receive from the transactions. Dickstein and Opper attended nearly all meetings of the Tribal Council and the Casino Board of Directors and injected themselves into all aspects of the Tribe's affairs to assert full control. They controlled the Tribe's decision-making process, in part, by not providing full information or by providing misinformation. They asserted power and influence over the Tribe's activities and investments, including the Tribe's relationships with outside parties and the hiring of personnel and consultants for the Tribal office. Dickstein and Opper also directed Boler, the outside accountant that paid invoices and maintained records for all of the Tribal government's financial activity. By controlling the information, the personnel and the decision-making process, Dickstein and Opper orchestrated a situation to take advantage of their Tribal client to benefit themselves and others to the Tribe's detriment.

6.   As the Tribe learned after terminating Dickstein and Opper, their advisors tried to cloak their actions with the appearance of Tribal legitimacy and authority, by inducing the Tribe's former Chairperson to take actions and execute documents without the Tribal Council's knowledge and consent. Dickstein and Opper did so, even though they knew—or should have known—that only the Tribal Council, consisting of five Tribal members elected by the Tribe's adult membership, had the power to manage the Tribe's economic affairs, and thus the power to approve such actions under Tribal law.

7.   Opper—in addition to cutting himself into various deals without full or sometimes *any* disclosure to the Tribal Council—collected fees for purportedly managing Tribal

1   assets, without actually managing them. His fee invoices listed assets over which he asserted no

2   actual managerial control or authority (including bank accounts and farm properties the Tribe

3   owned), and they included wildly inflated values for some of the assets. (Some of the properties

4   upon which Opper based his "real estate-related management" fees in later years are not even

5   fairly characterized as *real estate*.) Moreover, Opper did not submit the invoices to the Tribe for

6   review and approval before payment, but rather, simply submitted often-inflated invoices to

7   Dickstein and Boler. Dickstein authorized the payment of such invoices without questioning

8   them, and without ever submitting such invoices to the Tribe for review and approval. (The

9   Tribe now believes Opper's entire method and structure of compensation was an artifice created

10   to avoid regulatory oversight of Opper's management of an Indian-owned gaming facility,

11   which was illegal without the prior approval of the National Indian Gaming Commission.)

12       8.      Throughout, Dickstein led the Tribal Council to believe he was looking out for

13   the Tribe's best interests in his capacity as General Counsel. However, he repeatedly failed to

14   provide the Tribe legal guidance, either because he considered it beyond the purview of his role

15   as General Counsel or because it went beyond his expertise. In this vacuum, he failed to advise

16   the Tribal Council that he was not providing particular legal guidance the Tribe needed, let

17   alone, that the Tribe should seek and obtain such guidance. By doing so, he left the Tribe

18   unprotected in a variety of investments, as reflected by business terms disproportionately

19   favoring the non-Tribal investors (Dickstein's and Opper's personal friends and business

20   partners) over the Tribe and other Tribal investors (which somehow happened to be Dickstein

21   clients).

22       9.      Undoubtedly, the Tribe has experienced meteoric economic success. Not many

23   years ago, members of this small Indian tribe lived in relative poverty in substandard housing on

24   a remote parcel of reservation land with little hope for advancement or economic development.

25   However, with the advent of Indian gaming, and virtually overnight, the Tribe and its members

26   were thrust into the complexities of big business and finance, charged with operating a casino

27   that is not only a revenue-generating machine for the Tribe, but that has been fairly described as

28   the "economic engine" for all of Yolo County. They also found themselves, again literally

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882/

-4-

1   overnight, charged with running a government that actually had funds to provide for the health

2   and welfare of its members, and to invest for the Tribe's future.  If ever the members of this

3   historically-impoverished Tribe—members who were, for the most part, inexperienced and

4   unsophisticated in business—needed the guidance of their trusted advisors in matters of law and

5   finance, it was then.  That, however, is not what they received.  Indeed, instead of honoring their

6   duties of undivided fidelity and loyalty to the Tribe, Dickstein and Opper discarded those duties,

7   and in a serious breach of faith, placed their own interests (or those of others) ahead of the

8   Tribe's, in part, by cutting themselves into deals (or allowing others to do so), at the Tribe's

9   expense and without its knowledge and approval.

10      A.    **Overview of Claims Involving Dickstein**

11           10.    Dickstein's and others' misdeeds were particularly egregious given the nature

12   and length of their relationship with the Tribe.  Dickstein became the Tribe's General Counsel

13   over 20 years ago, in 1986.  As General Counsel, Dickstein attended virtually every meeting of

14   the Tribal Council as well as almost every meeting of the Casino Board of Directors.  As

15   General Counsel, Dickstein was a fiduciary who had a duty to advise the Tribe thoroughly and

16   competently with respect to the various legal and ethical issues that came before both bodies.

17   Where matters went beyond his competence, he had a duty to disclose his lack of expertise and

18   recommend that Rumsey secure separate legal advice or representation.  He was likewise

19   obligated to faithfully represent Rumsey's interests and to not subordinate them to the interests

20   of others, including other clients or parties.  He had a duty to avoid taking a personal financial

21   interest in any transaction on which he had a duty to give Rumsey advice, as well as to preserve

22   and protect the Tribe's property and interests.  He also had a duty to disclose any conflicts of

23   interest associated with his representation of Rumsey in a particular matter, and obtain

24   Rumsey's written waiver of those conflicts and consent to his continued representation, the

25   conflict notwithstanding.  And, he had a duty to timely and properly account for all funds he

26   received from Rumsey for use on Rumsey's behalf.  To carry out these and other duties, Rumsey

27   paid Dickstein well.  From 1993 until his dismissal in June 2006, Dickstein and his law firm

28

125 MARKET STREET, 26th FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

1    collected over $18 million in fees from Rumsey. In 2005 alone, he and his firm received over

2    $3.4 million.

3         11.    Notwithstanding his position as General Counsel and attendant duties, Dickstein

4    claims it was not his role to review the agreements for the Tribe's various investments. He takes

5    this position even though he was involved in the negotiations for some of the investments, the

6    original executed agreements were located in his files, and the agreements frequently listed him

7    as the Tribe's legal and/or primary contact. As important, he never told the Tribal Council that

8    he was not reviewing the agreements, and the Tribal Council understood otherwise. Dickstein

9    also provided no advice or warning to the Tribal Council about Opper's receipt of undisclosed

10   compensation from the various investments and the conflicts of interest that arose therefrom, not

11   to mention the existence of other investment terms that disproportionately favored the

12   investment's promoters. Nor did Dickstein inform the Tribal Council about his own conflicts of

13   interest in connection with the investments. For example, when Rumsey invested in the Lytton

14   Band's casino in San Pablo, Dickstein did not explain to the Tribal Council the implications of

15   his representing multiple clients in the same transaction. He previously had held himself out as

16   Lytton's General Counsel, and in this deal, along with Rumsey, he represented another of

17   Rumsey's co-investors—the Pala Band of Mission Indians. He also omitted that he stood to

18   gain $1 million annually in "pre-approved fee arrangements" under the terms of the management

19   agreement for the venture. (The management agreement also gave Opper $500,000 annually.)

20        12.    In addition to committing professional malpractice as described above, Dickstein

21   knowingly and repeatedly usurped the Tribe's governmental authority, and induced the Tribe's

22   former Chairperson to do so as well. As the drafter of the Tribe's Constitution, he well knew

23   that only the Tribal Council had the power to dispose of Tribal assets and enter contracts. Yet,

24   he often ignored this fact, acting unilaterally—or allowing and even facilitating others to do

25   so—in matters where Tribal Council approval was required but not obtained. Thus, Dickstein—

26   without consulting the Tribal Council—single-handedly set up the format and amount of

27   Opper's compensation. He likewise allowed the sale of Rumsey's interest in land near Raley

28   Field in West Sacramento in a sham transaction with no economic benefit to the Tribe,

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

-6-

1    undertaken solely to allow an entity controlled by defendant Mark I. Friedman ("Friedman") to

2    park its money in connection with a tax-free property exchange.  Neither Dickstein nor Opper

3    advised the Tribe it needed to timely exercise an option to repurchase the West Sacramento

4    property "sold" for another's tax benefit, thereby enabling the Friedman entity to later claim the

5    Tribe had lost the property, which was worth millions of dollars.

6         13.    In addition to negligently failing to honor a variety of duties to his clients,

7    Dickstein failed to account for his personal control and use of the Tribe's property.  He failed to

8    fully reimburse the Tribe for his (or his family members' and friends') frequent personal use of

9    airplanes for which the Tribe had purchased rights of use.  He has yet to provide adequate

10   support for over $1.2 million in expenses paid from the trust account his firm maintained for

11   expenses incurred on Rumsey's behalf.

12        **B.    Overview of Claims Involving Opper**

13        14.    In addition to negligently failing to honor a variety of duties to his clients, Opper

14   also used his position as a "consultant" and investment advisor to the Tribe to enrich himself.

15   The Tribe hired Opper as a gaming consultant in 1993, when the Tribe's gaming operations

16   were limited to bingo and a card room.  At that time, he had a written contract through which he

17   was paid based on a percentage of the card room's "adjusted gross profit."  Thereafter, Dickstein

18   restructured Opper's relationship with the Tribe, apparently in an effort to avoid federal

19   regulatory oversight, as detailed below.

20        15.    With the restructuring, Opper maintained his gaming contract (requiring him to

21   provide no fewer than 200 hours per month of "consulting" services), and was also paid to

22   "manage" the Tribe's investments.  As the Tribe's economic success grew, Opper's role

23   changed into one in which he made financial decisions for the Tribe.  Opper assumed the role of

24   negotiating the deals for the Tribe, reviewing and reporting the performance of its investments,

25   controlling the Tribe's bank accounts and using his undue influence to direct the Tribe's money

26   into a variety of deals that would ultimately benefit him at the Tribe's expense.  Opper's

27   agreement for "managing" the Tribe's investments was never reduced to writing and he and

28   Dickstein periodically decided which of the Tribe's assets he would be paid to "manage."

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF.   94105-2708
(415) 882

-7-

16.     It appears the real motivation for restructuring Opper's gaming contract was a concern that it was an illegal "management contract" under the Indian Gaming Regulatory Act, 25 U.S.C. §2701, *et seq.*, requiring the approval of the agency charged with regulating Indian gaming, the National Indian Gaming Commission ("NIGC"). Without such approval, Opper's agreement was void, since federal law requires all contractors who manage Indian-owned casinos to be approved by the NIGC. 25 U.S.C. §2711(a)(1); 25 C.F.R. §502.15. (Not ironically, the purpose of these restrictions was, in part, to protect tribes from unscrupulous contractors and overreaching. 25 U.S.C. §2702(1).) Accordingly, by restructuring Opper's contracts to pay him a set fee for "consulting" for the Casino, while paying him under a separate agreement for "managing" assets he did not actually manage, Dickstein and Opper ensured a continued cash flow of a particular sum to Opper, while circumventing the NIGC oversight otherwise required. (In truth, if Opper was managing under these contracts, irrespective of their terms and titles, his contracts were *de facto* management contracts and thus void.) Dickstein understood Opper's contracts required NIGC approval if they constituted "management contracts" on their face, but also if Opper performed management duties for the Casino. He never explained the significance of such to the Tribal Council.

17.     The agreements proved lucrative for Opper. From 1995 to 2006, Opper collected more than $17 million from both his casino contract and the "asset management fees" from the investments. But that was not enough. In many of the deals in which Opper recommended the Tribe invest, he took an equity or profit interest in the venture as well. He never sought the Tribal Council's approval for receiving interests in deals he recommended to the Tribe, unquestionably breaching his duty as the Tribe's fiduciary.

18.     Opper committed other breaches of his fiduciary duty. His "asset management fees" for "managing" the Tribe's real estate investments were based on a percentage of their claimed value. In some cases, he was paid multiple fees for "managing" the same investment; in other cases, he was paid for "managing" an asset that others (or no one) would manage (*e.g.*, a certificate of deposit the Tribe held in a bank); in still other instances, he inflated the assets' values. Dickstein was the only person who reviewed Opper's quarterly invoices for his work as

225 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF. 94105-2708
(415) 882-

1   a financial advisor. Dickstein neither provided the invoices to the Tribe nor ever advised the

2   Tribal Council of their existence, their amount, or the basis for Opper's quarterly payment.

* * *

4          19.    Dickstein's and Opper's self dealing and other acts occurred during a period of

5   rapid economic transformation for the Tribe. Undoubtedly, Dickstein and Opper both assisted

6   and benefited from that transformation. Nevertheless, no matter how great a principal's

7   economic success, the agent of that principal is still bound by his fiduciary duties and thereby

8   obligated to place the principal's interests ahead of his own. No amount of success permits the

9   egregious violation of duties demonstrated here. As a result of these breaches of trust and

10  confidence, and additional actions and omissions by Dickstein and Opper and others, the Tribe

11  has suffered economic injury in the millions of dollars and in an amount to be proven at trial.

12  **II.    PARTIES**

13         20.    The Tribe, the Plaintiff, is a sovereign Indian tribe, commonly known as the

14  Rumsey Band of Wintun Indians and officially recognized and registered by the United States as

15  the "Rumsey Indian Rancheria of Wintun Indians of California." 72 Fed. Reg. 13648 (2007). In

16  1907, the Tribe was forced off its ancestral lands and onto a federally-created rancheria, land the

17  United States holds in trust for the Tribe's use and benefit, in the Capay Valley of Yolo County,

18  near Brooks, California.

19         21.    In 1985, in an effort to gain economic self-sufficiency, the Tribe opened the

20  Cache Creek Indian Bingo and Casino on its trust land. After the passage of Proposition 5 in

21  1998, the Tribe expanded and transformed Cache Creek Indian Bingo and Casino into a larger

22  operation, which is known today as the Cache Creek Casino Resort.

23         22.    The Tribe's Constitution authorizes the Tribal Council to carry out certain

24  enumerated powers and duties on the Tribe's behalf, including the exclusive power:

25          •   to retain legal counsel;

26          •   to plan and manage the Tribe's economic affairs; and

27          •   to exercise any other powers necessary or convenient to carry out its

28              constitutional duties.

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF.   94105-2708
(415) 882-

23.     The Tribe's Constitution also provides that "[t]hree members of the Tribal Council shall constitute a quorum for the conduct of its business."

24.     From 1993 until January 2006, Chairperson Paula Lorenzo led the Tribal Council.  After a Tribal election in January 2006, Marshall McKay succeeded Ms. Lorenzo as the Tribe's Chairperson.

25.     Plaintiff Rumsey Government Property Fund I, LLC ("Rumsey GPF") is a limited liability company formed under Delaware law with the Tribe as its sole member. Rumsey GPF acts as an investment vehicle for the Tribe.

26.     Plaintiffs Rumsey Development Corporation, Rumsey Tribal Development Corporation, Rumsey Management Group and Rumsey Automotive Group are tribal corporations that act as investment vehicles for the Tribe.  Unless specified otherwise, the term "Tribe" includes all Plaintiffs—the Tribe, the Casino, Rumsey GPF, Rumsey Development Corporation, Rumsey Tribal Development Corporation, Rumsey Management Group and Rumsey Automotive Group.

27.     Defendant Dickstein is an attorney and practices law as a partner in Defendant Dickstein & Zerbi, which, on information and belief, is a law partnership that maintains an office at 1530 J Street in Sacramento, California.  The Tribe is informed and believes that Dickstein & Zerbi is the successor-in-interest to Defendant Dickstein & Merin, a partnership that ceased doing business in or about January 2003.

28.     Defendant Jane G. Zerbi ("Zerbi") is an attorney who, since at least 1996, assisted Dickstein in his role as General Counsel to the Tribe, both while working at Defendants Dickstein & Merin and Dickstein & Zerbi.  The Tribe alleges and believes that Zerbi currently practices law as a partner in Defendant Dickstein & Zerbi.  As a partner in the law firm of Dickstein & Zerbi, Defendant Zerbi is liable for her wrongful acts, as well as the wrongful acts of Dickstein and the law firm of Dickstein & Zerbi.

29.     The Tribe is informed and believes Defendant Dickstein & Merin is or was a law partnership and that during a portion of the time that Dickstein acted as General Counsel to the

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882

1    Tribe, he did so as a partner in Dickstein & Merin. The term "Attorney Defendants" refers

2    collectively to Dickstein, Zerbi, Dickstein & Zerbi, and Dickstein & Merin, as applicable.

3         30.    Defendant Opper is an individual who maintains an office at 1530 J Street in

4    Sacramento, California. The Tribe is informed and believes that Defendants Opper

5    Development, LLC, Metro V Property Management Company, and Capital Casino Partners I are

6    entities that Opper owns and controls. The term "Opper Defendants" refers collectively to

7    Opper as well as Opper Development, LLC, Metro V Property Management Company, and

8    Capital Casino Partners I, as applicable.

9         31.    Defendant Friedman is a real estate developer who maintains an office at 1530 J

10   Street in Sacramento, California. Friedman is apparently a personal friend and business partner

11   of Dickstein and Opper. Through various entities Friedman or his family own and/or operate

12   and control, Friedman acts or acted as the manager of certain investments in which the Tribe

13   participated. Entities that Friedman owns and/or operates and controls and that injured the Tribe

14   include Defendants Fulcrum Management Group LLC; Fulcrum Friedman Management Group

15   LLC, dba Fulcrum Management Group LLC; and 4330 Watt Avenue, LLC ("4330 Watt").

16   Friedman also owns and/or operates and controls Illinois Property Fund I Corporation, Illinois

17   Property Fund II Corporation, Illinois Property Fund III Corporation, all California corporations

18   and referenced collectively as "Illinois Property Fund:" Friedman and all of the foregoing

19   entities in this paragraph are referenced collectively as the "Friedman Defendants."

20        32.    Each Defendant was an agent, partner or joint venturer of each other Defendant

21   and at all relevant times acted within the scope of that agency, partnership or joint venture.

22        33.    The Tribe does not presently know the identity of those persons listed as Docs I

23   through 100 and sues such persons by such fictitious names. The Tribe will amend this

24   Complaint to allege their true names and capacities once ascertained. The Tribe is informed and

25   believes that each Doe Defendant committed some or all of the acts and omissions herein

26   alleged and/or claims title for an interest in the property herein described.

27        34.    Venue is proper in this County, because the contracts at issue were entered in this

28   County and were to be performed, and were performed, in this County.

35.     The Tribe and Defendants Dickstein, Zerbi and Dickstein & Zerbi entered an initial tolling agreement on February 20, 2007, tolling the running of any applicable statute of limitation until October 9, 2007.

36.     The Tribe and the Opper Defendants entered a tolling agreement on May 11, 2007, and such agreement tolled the running of any applicable statute of limitation until such time as the agreement has been revoked, which did not occur prior to this complaint's filing.

## III.     CLAIMS AGAINST DEFENDANTS

### A.     The Attorney Defendants' Duties.

37.     As the Tribe's General Counsel, the Attorney Defendants had a duty to zealously represent and protect the Tribe's interests and its related business enterprises. As General Counsel, the Attorney Defendants had a duty to exercise reasonable care, skill and diligence: (1) in investigating business matters, ethical issues, matters of Tribal governance, and rendering competent un-conflicted advice about such matters; (2) in investigating, reviewing, and drafting transactional documents to protect and further the Tribe's interests; (3) in investigating, recognizing, and addressing ethical and/or fiduciary responsibility issues for Tribal Council members, Tribal officers, Tribal fiduciaries, and all professionals and advisors who did business with the Tribe; (4) in ensuring that the Tribal Council and its officers complied with the Tribe's Constitution and Bylaws; and (5) in advising the Tribal Council that the Attorney Defendants could not or would not represent the Tribe or its entities in a particular transaction or context for whatever reason, including the fact that the matter went beyond their competence or expertise; and (6) in advising the Tribe that it needed to obtain separate legal advice or representation when the Attorney Defendants would not represent the Tribe or its entities in any matter.

38.     As General Counsel, the Attorney Defendants also owed fiduciary duties to the Tribe. These other duties included the duty of loyalty to the Tribe and the duty to: (1) faithfully represent the Tribe's interests and to not subordinate those interests to those of others; (2) avoid conflicts of interest arising from the Attorney Defendants' representation of other clients; (3) advise the Tribe of conflicts of interest involving other Tribal fiduciaries; (4) decline representation of the Tribe (in the absence of adequate written disclosure and informed written

1    client consent) if the Attorney Defendants had a personal financial interest in the transaction or

2    subject matter for which the Tribe needed advice; (5) preserve and protect the Tribe's property;

3    and (6) timely and properly account to the Tribe for all funds Attorney Defendants received

4    from the Tribe.

5        **B.**    **The Opper Defendants' Duties.**

6        39.    The Opper Defendants were the Tribe's agents and fiduciaries. They owed the

7    Tribe undivided duties of loyalty and honesty which required them, among other things, to make

8    the fullest disclosure of all material facts involved in the matters in which they were engaged

9    and which might affect the Tribe's decisions.

10       **C.**    **The Friedman Defendants' Duties.**

11       40.    The Friedman Defendants acted as managers of certain investments in which the

12   Tribe invested. As to those investments, the Friedman Defendants were the Tribe's fiduciaries

13   and, among other things, the Friedman Defendants were required to act in the "highest good

14   faith" towards the Tribe and not "obtain any advantage over [it] in the partnership affairs by the

15   slightest misrepresentation [or] concealment." *McCain v. Phoenix Resources, Inc.* (1986) 185

16   Cal. App. 3d 575, 579.

17       **D.**    **Opper's "Asset Management" Agreement.**

18       41.    Starting in 1993, the Tribe entered agreements with Capital Casino Partners I, a

19   partnership involving Opper, to provide consulting services to the Tribe in connection with the

20   Tribe's gaming operations. These agreements obligated Opper to devote "no fewer than

21   200 hours per month" to service the Casino. Although Opper's agreements were carefully

22   couched to state that he had no management duties at the Casino, by all accounts, Opper was

23   actively involved in all facets of the Casino's operation and he viewed himself as a key part of

24   the Casino's management.

25       42.    Opper's authority at the Casino included supervising the table games and bingo

26   managers, establishing the Casino budget, developing marketing strategy, approving hiring

27   decisions and negotiating with machine vendors and unions. Indeed, Opper claims to have been

28   responsible for much of the Casino's success, a theory wholly consistent with his assertion of

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

-13-
COMPLAINT

1    managerial control.  Under IGRA, any person who "manages" "all or part" of an Indian-owned

2    casino must be pre-approved by the NIGC or such management is illegal and any fees paid

3    subject to rescission.  On information and belief, Opper never submitted any of his consulting

4    agreements to the NIGC for its consideration and approval.

5        43.    On a date presently unknown to the Tribe, Dickstein restructured the form and

6    purported basis for Opper's compensation.  In addition to a consulting agreement, Dickstein

7    arranged for the Opper Defendants to be paid by the Tribe for, at least in part, recommending

8    Tribal investments and overseeing those investments.

9        44.    On information and belief, Dickstein and Opper purposefully structured Opper's

10   compensation so as to avoid triggering NIGC approval for his actual management of the Casino.

11   In reality, on information and belief, the asset management agreement that Dickstein and Opper

12   devised was an artifice to allow Opper to continue to exert managerial control of all or part of

13   the Tribe's Casino, while still securing a target sum that was roughly equivalent to what Opper

14   would have received under the initial "consulting" contract with the Casino, had it remained in

15   place.  This "separate" agreement between the Tribe and Opper was never memorialized to

16   writing.

17       45.    Pursuant to what was characterized as an "asset management" agreement, the

18   Opper Defendants submitted to Dickstein a quarterly invoice for their purported management of

19   Tribal assets.  The fees were based on a percentage of the assets' claimed value supposedly

20   under the Opper Defendants' "management."  The precise percentage was set by Dickstein

21   and/or Opper without approval of the Tribal Council, the only Tribal body with authority to

22   provide such approval.  Dickstein received invoices from the Opper Defendants, and he or

23   Opper would then advise Boler, the accountant, of the amount due.  Boler would arrange a check

24   for the claimed amount to be issued to the Opper Defendants.  In some instances, the Opper

25   Defendants grossly inflated the values for certain of the assets listed on the invoices, thereby

26   increasing the compensation paid them.  Notably, Dickstein and the Opper Defendants never

27   submitted the invoices to the Tribe, and the Tribe never saw the invoices or their inflated values.

28

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF. 94105-2708
(415) 8825

-14-

E.   **GPF.**

46.   In 1998, the Tribe, through Rumsey GPF, invested with Friedman and his family in Government Property Fund, LLC, Government Property Fund II, LLC and Government Property Fund III, LLC (collectively "GPF"). GPF was an investment vehicle designed to purchase and own office buildings in Illinois. Prior to the Tribe's investment in GPF, Dickstein, Opper and Friedman met with the Tribal Council and explained the nature of the investment, representing that it was "a 50-50 venture between the Rumsey Tribe and the Friedmans." On the basis of representations by Dickstein, Opper and Friedman, the Tribal Council authorized the investment and in December 1998, the Tribe's Chairperson executed the GPF operating agreements ("Executed GPF Operating Agreements").

47.   Consistent with defendants' representations, and pursuant to the Executed GPF Operating Agreements, GPF's members were the Tribe's entity, Rumsey GPF, and two Friedman-owned and controlled entities, GPF Illinois, LLC ("GPF Illinois") and Illinois Property Fund. The Executed GPF Operating Agreements made Illinois Property Fund exclusively responsible for managing GPF's business and affairs.

48.   In each of the Executed GPF Operating Agreements, each member represented, warranted and agreed that it acquired its interest in GPF "for its own account and not as nominee or agent or any other Person, and not with a view to the sale or distribution of any or all thereof..." Each member also represented, warranted and agreed that "it ha[d] no present intention of selling, granting a participation in or otherwise distributing" its interest in GPF. The members also agreed the Executed GPF Operating Agreements constituted "the complete and exclusive statement of the agreement among the Members" and that "[i]t supersede[d] all prior written and oral statements and no representation, statement, condition or warranty not contained in this Agreement shall be binding on the Members." The Executed GPF Operating Agreements also stated that they could "be modified or amended only by an instrument signed in writing by all the Members."

49.   GPF's lawyers further warranted to GPF's lender that the sole members of GPF were those identified in the Executed GPF Operating Agreements: the Tribe's entity and the two

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

-15-

Friedman-owned entities. The Tribe's Chairperson and Friedman separately affirmed the

accuracy of the facts upon which GPF's lawyers' warranty to the GPF lender was based.

50.    Thereafter, at Dickstein's and Opper's direction, and without the Tribal Council's

knowledge, then-Chairperson Lorenzo signed a letter Dickstein prepared purporting to assign to

Opper 5.775% of the Tribe's profit interest in Government Property Fund, LLC and the Tribe's

"Special Distribution" (referenced hereafter as "GPF Assignment Letter"). Dickstein and Opper

knew the Tribal Council had neither discussed nor authorized these assignments. They also

never advised Chairperson Lorenzo that she needed governing body approval before purporting

to bind the Tribe. The GPF Assignment Letter also requests that "copies of all checks or other

evidence of payments [be provided] to [the Tribe's] legal counsel, Howard Dickstein..."

51.    In response to the GPF Assignment Letter, Friedman, through Illinois Property

Fund, paid Opper the Tribe's Special Distribution and also 5.775% of the Tribe's profit interest.

Although the GPF Assignment Letter only purported to assign to Opper the Special Distribution

and the 5.775% profit interest for Government Property Fund, LLC, and even though the GPF

Assignment Letter does not mention Government Property Fund II, LLC and Government

Property Fund III, LLC, Friedman (through Illinois Property Fund) paid Opper a similar portion

of the Tribe's interests in those entities.

52.    Additionally, Friedman instructed Dickstein and Opper to substitute the Executed

GPF Operating Agreements with a new operating agreement that decreased the amount of the

Special Distribution and changed the priority of cash available for distribution that the Tribe was

to receive. He specifically instructed them "to substitute the new text for that previously

executed by the Rumsey representatives. Please attach the signature pages from the prior

agreement to the new document and discard the old operating agreement." Dickstein and Opper

carried out the instructions, even though they had the effect of decreasing the Tribe's share.

Friedman, Dickstein and Opper took such actions in violation of the express terms of the

Executed GPF Operating Agreements and without notifying the Tribal Council or obtaining its

consent.

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 832

53.     Pursuant to the above actions, the Friedman Defendants, Opper and Dickstein caused GPF to distribute monies to Opper and the Friedman Defendants that the Tribe had understood (and agreed) would be paid to the Tribe. Specifically, the 50-50 allocation of the Special Distribution between GPF Illinois, the Friedman-controlled entity, and the Tribe was revised such that the Friedman entity received 75% and the Tribe 25%.

54.     Opper now contends he is a member of GPF, even though none of the GPF operating agreements (including the swapped agreements) mention Opper as a member. Indeed, the GPF operating agreements explicitly state that the only members are the Tribe's entity (Rumsey GPF) and two Friedman-controlled entities (GPF Illinois and Illinois Property Fund), and they further state that the agreements constitute "the complete and exclusive statement of the agreement among the Members." Despite this fact, without the Tribal Council's knowledge or approval, Friedman and Illinois Property Fund caused GPF—with Dickstein's knowledge—to pay Opper sums that were payable to the Tribe under the terms of the Executed GPF Operating Agreements. The Tribe lacked knowledge of these payments to Opper because Friedman, through Illinois Property Fund, sent all payments and accounting records (including the Tribe's payments) only to Opper.

55.     Notwithstanding his duties as the Tribe's fiduciary, Opper never informed or sought approval from the Tribal Council to receive any of these monies from GPF. The Attorney Defendants also failed to disclose to the Tribe (1) an arrangement through which Opper secured an interest in GPF and which contradicted the express terms of the Executed GPF Operating Agreements; (2) any changes in or modifications to the Executed GPF Operating Agreements being proposed or requested by the other members; and (3) the existence of any funds being paid Opper from GPF, and the conflicts of interest that would arise therefrom.

56.     Further, Friedman and Illinois Property Fund, as the Tribe's fiduciaries with respect to GPF, never disclosed to, nor received the approval of, the Tribal Council for (1) distribution of a portion of the Tribe's profit interest to Opper; and (2) substitution of a new operating agreement that decreased the Tribe's Special Distribution and gave it instead to Friedman.

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

-17-

57.     GPF was the first of several transactions in which Opper, without the Tribe's knowledge and authorization and in breach of his duties as the Tribe's agent and fiduciary, acquired equity or other interests in the very same investments in which the Tribe invested.

58.     The Tribe first discovered the acts, injuries and damages described above after the Tribe terminated Dickstein and Opper and secured its records from them.

F.     **GPF IV (IRS Building).**

59.     After the investment in GPF, Opper brought another investment to the Tribe, Government Property Fund IV, LLC ("GPF IV"), which would acquire the Internal Revenue Service building in Sacramento ("IRS office building").

60.     GPF IV was formed as a limited liability company consisting of the following members: the Tribally-owned entity Rumsey GPF and 4330 Watt, an entity Friedman managed and partially owned. The Friedman-managed entity, 4330 Watt, was GPF IV's manager.

61.     Friedman, as the manager of 4330 Watt, caused GPF IV to enter a management agreement with Fulcrum Management Group LLC and/or Fulcrum Friedman Management Group, LLC (collectively "Fulcrum") to operate and manage the IRS office building.

62.     The GPF IV operating agreement, executed in May 2000, contained terms and provisions similar to those for GPF ("GPF IV Operating Agreement"). For example, like the Executed GPF Operating Agreements, the GPF IV Operating Agreement does not identify Opper as a Member or as being entitled to any distributions. It also explicitly states that "[e]ach Member represents and warrants" that it is acquiring its interest in GPF IV "for its own account and not as nominee or agent for any other Person, and not with a view to the sale or distribution of any or all thereof." Each Member also represented that it had no "intention of selling, granting a participation in, or otherwise distributing" its interest in GPF IV to another.

63.     Despite these facts, Friedman, through 4330 Watt and Fulcrum, caused GPF IV to pay Opper the Tribe's Special Distribution fees as well as 5.775% of the Tribe's profit distributions. He did so even though the GPF IV Operating Agreement explicitly provided that such would be paid to the Tribe. Notwithstanding their duties as the Tribe's fiduciaries, neither Friedman nor Opper disclosed to the Tribal Council, nor obtained its authorization, for the

-18-

COMPLAINT

1   distribution of these monies to Opper. Opper knew or should have known the Tribal Council

2   had not discussed or authorized this purported assignment.

3          64.     Thereafter, GPF IV sold the IRS office building. Just before the close of the sale,

4   then Chairperson Paula Lorenzo signed a letter purportedly confirming an "oral agreement"

5   between the Tribe and Opper under which the Tribe transferred to Opper, among other things, "a

6   portion of its membership interest in Government Property Fund IV, LLC," consisting of a

7   specified "future profits interest." On information and belief, Dickstein prepared the letter

8   signed by Lorenzo (referenced hereafter as "GPF IV Assignment Letter"). The Tribal Council

9   had no knowledge of this purported transfer. Dickstein and Opper knew the Tribal Council had

10  neither discussed nor authorized this purported transfer, and they never advised Chairperson

11  Lorenzo that she needed governing body approval before purporting to bind the Tribe.

12         65.     On the close of the sale, Opper received $673,857 from the proceeds.

13  Notwithstanding their fiduciary duties to the Tribe, neither Opper nor Friedman disclosed to the

14  Tribal Council that Opper would receive this money. Opper knew or should have known the

15  Tribal Council had not discussed or authorized this purported assignment.

16         66.     · In addition, the Attorney Defendants failed to disclose to the Tribe (1) the

17  arrangement through which Opper purportedly secured an interest in GPF IV and which

18  contradicted the express terms of the GPF IV Operating Agreement; (2) the purported "oral

19  agreement" transferring a portion of the Tribe's interest in GPF IV or the GPF IV Assignment

20  Letter purporting to memorialize it; and (3) the existence of any funds being paid Opper from

21  GPF IV, and the conflicts of interest that would arise therefrom.

22         67.     The Tribe first discovered the acts, injuries and damages described above after

23  the Tribe terminated Dickstein and Opper and secured its records from them.

24         G.     **Lytton.**

25         68.     In 2000, the Tribe acquired an interest in an entity seeking to develop and

26  manage a casino in San Pablo, California owned by the Lytton Band of Pomo Indians ("Lytton

27  Band").

28

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-5000

-19-

69.     In 2003, apparently upon Dickstein's and Opper's recommendation, the structure and terms of the arrangement with the Lytton Band changed.  The existing agreements for the development and management of the Lytton Band's casino were terminated and new agreements were reached between the Lytton Band and California Indian Gaming Development, LLC ("CIGD") and California Indian Gaming Management, LLC ("CIGM").  CIGD and CIGM were newly formed limited liability companies comprised of the Rumsey Management Group ("RMG"), an entity the Tribe owned; the Pala Management Group (an entity owned by the Pala Band of Mission Indians ("Pala Band")); Maloof Gaming, LLC (an entity the Maloof family owned and controlled); Opper Development, LLC (an Opper Defendant); N.A.E. (an entity Richard Bronson owned and controlled); and Turk Lytton L.P. (an entity owned and controlled by Jerome H. Turk, the Pala Band's business manager).

70.     As the Tribe's General Counsel, the Attorney Defendants failed to zealously represent the Tribe's interests when negotiating the terms of the relationship between the Tribe and the Lytton Band, and when restructuring that relationship with the formation of CIGD and CIGM and the Tribe's membership in those entities, through RMG.  A reasonable, competent, loyal, diligent, and ethical General Counsel should and would have zealously advised the Tribe and represented its interests, not those of others.

71.     While the Attorney Defendants were supposedly representing the Tribe's interests in connection with the development and management of the Lytton Band's casino, they were also acting as General Counsel to the Pala Band, another participant in the Lytton deal.  The Attorney Defendants never disclosed to the Tribe this conflict of interest or how the conflict might adversely affect their legal representation.  The Attorney Defendants never sought or obtained the Tribe's consent or a waiver of any conflict of interest in connection with their simultaneous representation of the Tribe and the Pala Band in the Lytton deal.

72.     In addition, the Tribe is informed and believes that while the Attorney Defendants ostensibly represented the Tribe's interests in connection with the development and management of the Lytton Band's casino, the Attorney Defendants had previously held themselves out as General Counsel to the Lytton Band.  The Attorney Defendants never

disclosed to the Tribe this conflict of interest or how the conflict might adversely affect their legal representation of the Tribe. The Attorney Defendants did not seek or obtain the Tribe's consent or a waiver of any conflict of interest in connection with their representation of the Lytton Band in the Lytton deal.

73.   The CIGD and CIGM operating agreements provide for remuneration to both Dickstein and Opper at the expense of the Tribe and the other CIGD and CIGM members. Specifically, Paragraph 8.3 of the CIGM operating agreement provides that effective January 1, 2004, Dickstein and Opper were to receive annual payments of $1 million and $500,000, respectively, as "pre-approved fee arrangements." Opper has received $1.5 million under this provision. In addition, the CIGM and CIGD operating agreements listed Opper Development, LLC as a 3.45% owner of CIGD and CIGM and the Tribe, through RMG, as a 45% owner of the entities. However, upon the repayment of each member's invested capital in CIGD and CIGM, Opper's ownership interest in the entities (through Opper Development LLC) would increase from 3.45% to 8.59% without any further investment of funds. Correspondingly, the Tribe's ownership interest in the entities would decline from 45% to 33.75%. As a result of this provision, Opper now owns 8.59% of CIGD and CIGM, while the Tribe's interest has now been reduced to 33.75%. This was one of several deals in which the Tribe (with or without other Tribal investors also represented by Dickstein) invested the most money on the front end with decreasing returns on the back end.

74.   In addition, neither Dickstein nor Opper negotiated commercially reasonable terms for the Tribe's investment in CIGD and CIGM. The Tribe assumed disproportionate risk relative to the other investors and its ultimate returns. The Tribe initially invested over $6 million, which was treated as an interest-free loan to CIGD and CIGM without any preferred return. Further, the "pre-approved fee arrangements" for Dickstein and Opper were to be paid before the return of capital the Tribe invested.

75.   Opper turned the Lytton investment into a wildly lucrative, and unjustified, opportunity for himself. He effectively "triple dipped," paying himself three ways for purporting to manage the Lytton investment. In addition to his $500,000 annual "pre-approved

523 MARKET STREET, 26th FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

1  fee arrangement," and his springing ownership in CIGD and CIGM (which increased without

2  any further investment of funds by Opper), Opper saw fit to list the Lytton investment as an

3  asset he "managed" on the quarterly fee statements he submitted to Dickstein. Although the

4  Tribe had yet to receive a single dollar from the Lytton investment, Opper steadily increased the

5  value of the investment on his quarterly statements, which initially valued the asset at $2.9

6  million and ultimately reached a high of $24 million. In one quarter, he brazenly increased the

7  value of the investment from $6.3 million to $16.3 million. For that asset alone, the $10 million

8  boost in valuation increased his "asset management" fees on a yearly basis by $225,000.

9       76.    Neither Dickstein nor Opper disclosed to the Tribal Council, nor sought its

10  authorization for, the pre-approved fee arrangements set forth in the CIGM operating agreement.

11  Notwithstanding his status as a fiduciary, Opper never disclosed to the Tribal Council his

12  acquisition of an ownership interest in CIGD and CIGM, including the "carried interests" by

13  which Opper's ownership of CIGD and CIGM increased at the expense of the Tribe (and that of

14  the other tribal investor—the Pala Band), whose interests would correspondingly decrease.

15  Opper also never disclosed that he received compensation three different ways for purporting to

16  manage the Lytton investment.

17       77.    In January 2004, at Dickstein's and Opper's behest, then-Chairperson Lorenzo

18  signed the operating agreements for CIGD and CIGM, purportedly on the Tribe's behalf. The

19  Tribal Council had no knowledge of and never approved the pre-approved fee arrangements set

20  forth in the CIGM operating agreement, Opper's acquisition of an ownership interest in CIGD

21  and CIGM, or the "carried interests" by which Opper's CIGD and CIGM ownership would

22  increase at the Tribe's expense. Dickstein, as the Tribe's General Counsel, knew or should have

23  known the Tribal Council had not discussed or approved the terms of the operating agreements.

24  Neither he nor the other Attorney Defendants ever advised Chairperson Lorenzo that she needed

25  governing body approval before purporting to bind the Tribe to the undisclosed terms of the

26  operating agreements.

27       78.    Notably, when Dickstein became aware that the Tribe's new legal counsel was

28  investigating this transaction (including Dickstein's conduct, advice and legal representation), he

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

-22-

COMPLAINT

belatedly declined to accept the $3 million in "pre-approved fee arrangements" purportedly due him under the CIGM operating agreement.

79.    The Attorney Defendants breached their duties to faithfully and zealously represent the interests of the Tribe in the negotiation of these agreements. They failed to advise the Tribe of the "pre-approval fee" arrangements favoring Dickstein and Opper. The Attorney Defendants failed to advise the Tribe that because of Dickstein's and Opper's personal financial interest in the pre-approved fee arrangements, and Opper's ownership interests, that Dickstein's and Opper's interests were adverse to the Tribe's. The Attorney Defendants also failed to alert the Tribe of the nature and extent of Opper's ownership interest in CIGD and CIGM, and that he was "triple-dipping" from the same investment. They also failed to advise the Tribe about the Tribe's rights and Opper's fiduciary responsibilities.

80.    The Tribe first discovered some of the acts, injuries and damages described above after the Tribe retained Kroll. The Tribe discovered the balance of the acts, injuries and damages described above after Dickstein's and Opper's termination and the Tribe secured its records from them.

### H.    LASCAL.

81.    Contemporaneous with the restructuring of the Tribe's investment in the Lytton Band's casino project, the Tribe invested in LASCAL Land Development, LLC ("LASCAL"), an entity seeking to develop land in Nevada, belonging to the Las Vegas Paiute Tribe.

82.    The members of LASCAL nearly mirrored those in CIGD and CIGM, including the Tribe (through RMG), the Pala Management Group, the Maloof family, Opper Development, LLC and Turk Paiute, L.P., an entity controlled by Turk, the Pala Band's business manager.

83.    Dickstein, Zerbi and Dickstein & Zerbi also represented the Pala Band in the LASCAL transaction. Dickstein, Zerbi and Dickstein & Zerbi did not disclose to the Tribe their conflict of interest in simultaneously representing multiple parties in the transaction or explain the potential and adverse significance of this conflicted representation. They also never sought

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFO..., 94105-2708
(415) 882-...

1    or obtained the Tribe's consent and waiver of any conflict of interest in connection with

2    representing both tribal clients in LASCAL.

3         84.    The LASCAL operating agreement contains provisions that economically benefit

4    Opper at the Tribe's expense.  Opper Development, LLC was a 3% owner of LASCAL and the

5    Tribe was a 45% owner.  However, upon the repayment of each member's invested capital,

6    Opper's ownership interest increased from 3% to 8.25% without any further investment of

7    funds.  Correspondingly, the Tribe's ownership interest in LASCAL decreased from 45% to

8    33.75%.

9         85.    In or about January 2004, at the request of Dickstein and/or Opper, then-

10   Chairperson Lorenzo signed the LASCAL operating agreement.  Opper never sought or obtained

11   the Tribal Council's approval of his ownership interest in LASCAL, through Opper

12   Development, LLC.  Further, neither Dickstein nor Opper disclosed to the Tribal Council that

13   the LASCAL agreement's structure contained a "carried interest" in which Opper's ownership

14   increased at the expense of the two Tribal investors (the Tribe and the Pala Band), whose

15   interests would correspondingly decrease.  Dickstein and Opper knew, or should have known,

16   that the Tribal Council never authorized the terms of the investment.  Thereafter, Opper did

17   obtain a 3% ownership interest in LASCAL.

18        86.    Dickstein, Zerbi and Dickstein & Zerbi, failed to faithfully and zealously

19   represent the Tribe's interests in negotiating the LASCAL operating agreement.  Dickstein,

20   Zerbi and Dickstein & Zerbi failed to advise the Tribe about the Tribe's rights, the nature and

21   extent of Opper's ownership interest in LASCAL, and Opper's fiduciary duties and

22   responsibilities to the Tribe.

23        87.    The Tribe first discovered some of the acts, injuries and damages described above

24   after the Tribe retained Kroll.  The Tribe discovered the balance of the acts, injuries and

25   damages described above after Dickstein's and Opper's termination and the Tribe secured its

26   records from them.

27

28

1  **I.   Evergreen Investors, L.P.**

2   88.   In 2005, Opper recommended that the Tribe invest in Evergreen Investors, L.P.

3  ("Evergreen"), which consisted of Evergreen Commercial, United Auburn Indian Community

4  ("Auburn") and the Tribe.  Evergreen was to become a member of B and W 60, LLC, which was

5  to develop a commercial retail center at Baseline and Watt in North Highlands, California.

6   89.   Under Evergreen's limited partnership agreement, Opper, without investing any

7  capital of his own, was granted status as a "Class B Limited Partner," entitling him to receive

8  6.37755% of the Evergreen profits.  Notwithstanding his duties as a fiduciary, Opper never

9  disclosed these facts to the Tribal Council.

10   90.   Dickstein, Zerbi and Dickstein & Zerbi also represented Auburn in the Evergreen

11  transaction. Dickstein, Zerbi and Dickstein & Zerbi did not disclose to the Tribe their conflict of

12  interest in simultaneously representing multiple parties in the transaction or explain the potential

13  and adverse significance of this conflicted representation. They also never sought or obtained

14  the Tribe's consent and waiver of any conflict of interest in connection with representing both

15  Tribes in this investment.

16   91.   Dickstein, Zerbi and Dickstein & Zerbi, knew or should have known, and Opper

17  knew, that these matters had not been discussed with, or authorized by, the Tribe's governing

18  body. Dickstein, Zerbi and Dickstein & Zerbi, failed to faithfully and zealously represent the

19  Tribe's interests in negotiating the Evergreen agreement, allowed the Tribe's fiduciary Opper to

20  profit at the Tribe's expense, and failed to disclose the nature and extent of Opper's ownership

21  interest in Evergreen.

22   92.   The Tribe first discovered some of the acts, injuries and damages described above

23  after the Tribe retained Kroll.  The Tribe discovered the balance of the acts, injuries and

24  damages described above after Dickstein's and Opper's termination and the Tribe secured its

25  records from them.

26

27

28

-25-

**J.     Zamora 526 Investors, LLC.**

93.     In 2005, Opper recommended to the Tribe that it invest—through Rumsey GPF—in Zamora 526 Investors, LLC ("Zamora") to acquire and develop 526 acres of unimproved property in Yolo County.

94.     Unbeknownst to the Tribe, Zamora's manager granted Opper a 10% interest in Zamora apparently in exchange for Opper bringing the Tribe into the investment.  Opper also received a "transaction fee" equal to 0.2% of the price of the parcel Zamora purchased.

95.     In recommending Zamora to the Tribe, and notwithstanding his fiduciary duties, Opper never disclosed to, or obtained the approval of, the Tribal Council to become a member in Zamora or to receive the transaction fee.  In addition to failing to disclose his own interest, Opper failed to disclose that Friedman obtained a 15% interest in the investment as well as a "transaction fee."

96.     The Zamora operating agreement contains provisions highly unfavorable to the Tribe.  The Tribe, through Rumsey GPF, was required to put up 100% of the capital to buy the Zamora property ($10.5 million), and yet, receives only 50% of the partnership's profit once the capital is repaid.  In contrast, Opper and Friedman obtained their interests in Zamora without investing any initial capital.  In addition, there is no limit to the additional capital the Tribe may be required to contribute.  Finally, the Tribe's preferred return on its invested capital is far below market relative to the risk it assumed.  Under these provisions, the Tribe fronted all the money for the Zamora land acquisition, thereby bearing all the risk, but is entitled to only half of any future profit.

97.     Dickstein, Zerbi and Dickstein & Zerbi knew or should have known, and Opper necessarily knew, about these self-dealing provisions, the secret compensation Opper and Friedman received, and that the Tribal Council had never discussed or approved these ownership interests and fees.

98.     Dickstein, Zerbi and Dickstein & Zerbi, failed to faithfully and zealously represent the Tribe's interests in negotiating the Zamora operating agreement, failed to advise the Tribal Council about Opper's and Friedman's secret compensation and their receipt of

transaction fees in connection with the purchase. A reasonable, competent, loyal, diligent, and ethical General Counsel would have disclosed and explained the Tribe's rights; the adverse conflicts of interest due to Opper and Friedman having undisclosed financial interests in the transaction; explained the legal and practical significance of Opper's fiduciary duties and responsibilities, and how the self-dealing might adversely affect his objectivity; and ensured the Tribal Council actually knew or, and approved, such arrangement and conflict, and further ensured that such approval was properly documented.

99.     The Tribe first discovered some of the acts, injuries and damages described above after the Tribe retained Kroll. The Tribe discovered the balance of the acts, injuries and damages described above after Dickstein's and Opper's termination and the Tribe secured its records from them.

**K.     Knights Landing, LLC.**

100.     In 2005, Opper recommended to the Tribe that it invest—through Rumsey GPF—in Knights Landing Investors, LLC ("Knights Landing") to acquire and develop 730 acres of unimproved property in Yolo County.

101.     Unbeknownst to the Tribe, Knights Landing's manager granted Opper a 10% interest in Knights Landing apparently in exchange for Opper bringing the Tribe into the investment. Opper also received a $24,000 "transaction fee" when the Knights Landing parcel was purchased.

102.     In recommending Knights Landing to the Tribe, and notwithstanding his fiduciary duties, Opper never disclosed to, or obtained the approval of, the Tribal Council to become a member in Knights Landing or to receive the transaction fee. In addition to failing to disclose his own interest, Opper failed to disclose that Friedman obtained a 15% interest in the investment as well as a "transaction fee."

103.     The Knights Landing operating agreement contains provisions highly unfavorable to the Tribe. The Tribe was required to put up 100% of the capital to buy the Knights Landing property ($11.5 million), and yet, receives only 46.875% of the partnership's profit once the capital is repaid. In contrast, Opper and Friedman obtained their interests in

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

Knights Landing without investing any initial capital. In addition, the Tribe is obligated to contribute 84.375% of additional capital and there is no limit to the additional capital the Tribe may be required to contribute. Finally, the Tribe's preferred return on its invested capital is far below market relative to the risk it assumed. Under these provisions, the Tribe fronted all the money for the Knights Landing land acquisition, thereby bearing all the risk, but is entitled to less than half of any future profit.

104.   Dickstein, Zerbi and Dickstein & Zerbi knew or should have known, and Opper necessarily knew, about these self-dealing provisions, the secret compensation Opper and Friedman received, and that the Tribal Council had never discussed or approved these ownership interests and fees.

105.   Dickstein, Zerbi and Dickstein & Zerbi, failed to faithfully and zealously represent the Tribe's interests in negotiating the Knights Landing operating agreement, failed to advise the Tribal Council about Opper's and Friedman's secret compensation and their receipt of transaction fees in connection with the purchase. A reasonable, competent, loyal, diligent, and ethical General Counsel should have disclosed and explained the Tribe's rights and Opper's role as a fiduciary; the adverse conflicts of interest from Opper's and Friedman's undisclosed financial interests in the transaction; the legal and practical significance arising from such conflicts, including how the transaction might adversely affect Opper's advice and representation; ensured the Tribal Council actually knew or, and approved, such arrangement and conflict; and further ensured that such approval was properly documented.

106.   The Tribe first discovered some of the acts, injuries and damages described above after the Tribe retained Kroll. The Tribe discovered the balance of the acts, injuries and damages described above after Dickstein's and Opper's termination and the Tribe secured its records from them.

L.   **Vectors Research Opportunities Fund, L.P.**

107.   In 2005, Dickstein and/or Opper caused the Tribe to invest in Vectors Research Opportunities Fund, L.P. ("Vectors"), which was to purchase and trade securities and other financial instruments. The Tribe and Auburn, both Dickstein & Zerbi clients, contributed 88%

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

1   of the partnership's capital. The Tribe invested $10 million and Auburn invested $5 million of

2   the $17 million initial total investment. The investment never went before the Tribal Council.

3     108. The other Vectors partners included Dickstein and Opper, as well as Friedman,

4   Friedman's father and brother, and John Krasznekewicz (a Friedman friend).

5     109. Dickstein and/or Opper caused then-Chairperson Paula Lorenzo to sign, on behalf

6   of the Tribe, a side agreement letter with Vectors. The side agreement reduced the management

7   fee the Tribe and the other investors, including Dickstein, Opper and Friedman, paid to Vectors

8   from 1.5% to 1%. However, while the savings should have inured to all investors, including the

9   Tribe and Auburn, the Tribal investors' savings were instead used to pay additional monies to

10   Opper and Friedman.

11     110. Specifically, after the reduction in the management fee, Dickstein, Opper and/or

12   Friedman caused then-Chairperson Lorenzo to execute a side agreement with Rustic Partners, an

13   entity Krasznekewicz controlled. This second agreement purportedly required the Tribe to pay

14   Rustic Partners a 0.5% fee—the exact same amount the Tribe saved as a result of the reduced

15   Vectors management fee—to supposedly administer the Tribe's investment in Vectors. (On

16   information and belief, there existed a similar agreement with Auburn, requiring Auburn to pay

17   Rustic Partners an identical fee.) Without the Tribal Council's knowledge or consent, Opper

18   and Friedman then entered a side letter agreement with Rustic Partners, by which Opper,

19   Friedman and Krasznekewicz would share the 0.5% administrative fee the Tribe had saved

20   under the first agreement. In reality, Rustic Partners provided no services at all, because Vectors

21   itself fully managed its investment portfolio.

22     111. In exchange for reducing the management fee (a savings ultimately paid out to

23   Opper, Friedman and Krasznekewicz, not the Tribe), the Tribe gave up certain rights, including

24   the right to withdraw its capital without restriction.

25     112. Neither Dickstein, Opper nor Friedman disclosed this administrative fee

26   arrangement to the Tribal Council. Nor did they seek or obtain Tribal Council approval to

27   receive this administrative fee. To the contrary, they encouraged the Tribe's former Chairperson

28

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

1   to execute such documents, without advising her that governing body approval was required for

2   her to bind the Tribe.

3       113.   Dickstein and Opper never obtained the Tribal Council's approval to become co-

4   investors with the Tribe in Vectors, let alone disclose the potentially adverse consequences

5   associated with their personal investment.  In addition, Dickstein, Zerbi and Dickstein & Zerbi

6   did not disclose to or discuss with the Tribe their conflicts of interest or the potentially adverse

7   consequences of representing two parties to the same investment (they also represented Auburn).

8   They also did not obtain the Tribe's consent or waiver of any conflict of interest in connection

9   with this representation.

10       114.   Dickstein, Zerbi and Dickstein & Zerbi failed to faithfully and zealously

11   represent the Tribe's interests in negotiating the Vector partnership agreements.  A reasonable,

12   competent, loyal, diligent, and ethical General Counsel would have disclosed and explained the

13   Tribe's rights; the adverse conflicts of interest due to Dickstein and Opper having undisclosed

14   financial and ownership interests in the transaction; explained the potential significance of such

15   conflicts of interest, not to mention, the fiduciary duties and responsibilities of Dickstein and

16   Opper; explained how such adverse and conflicting interests might adversely affect their advice

17   and representation; and recommended that the Tribal Council obtain independent, objective, and

18   un-conflicted legal and financial advice.  A reasonable, competent, loyal, diligent, and ethical

19   General Counsel also would have ensured the Tribe's governing body was informed of these

20   facts, and that any Tribal Council decision on whether to obtain independent legal or financial

21   advice and/or to continue with Defendants' conflicted representation and the transaction was

22   properly documented and recorded.

23       115.   The Tribe first discovered the acts, injuries and damages described above after

24   the Tribe terminated Dickstein and Opper and secured its records from them.

25       **M.**   **Wood River II L.P. Fund.**

26       116.   In July 2003, without the Tribal Council approval, Opper directed Banc of

27   America Securities to invest $3 million of the Tribe's funds in the Wood River II L.P. Fund

28

1  ("Wood River"), a hedge fund. The investment never came before the Tribal Council for

2  approval.

3      117.    On a date presently unknown to the Tribe, Wood River became insolvent and the

4  Tribe has lost its $3 million investment.

5      118.    The Tribe first discovered the acts, injuries and damages described above after

6  the Tribe terminated Dickstein and Opper and secured its records from them.

7      N.    **The Triangle "Parking" Transaction.**

8      119.  . In 2001, the Tribe, through Rumsey GPF, purchased a 50% interest in a parcel of

9  unimproved land in West Sacramento known as the Scanvik property. The Friedman family

10  purchased the other 50% interest in the Scanvik property.

11      120.    In 2004, Friedman approached the Tribe, through Dickstein and/or Opper, and

12  requested an accommodation. The Tribe is informed and believes that Friedman, through

13  4330 Watt, had previously sold his interest in another property and needed to place the proceeds

14  from that sale in a tax-free exchange. To preserve the proceeds' tax-deferred status, Friedman

15  proposed to "park" them with the Tribe for a period of approximately 18 months. This "parking

16  transaction" required a purported "sale" of a substantial portion of the Tribe's interest in the

17  Scanvik property to 4330 Watt. Specifically, Friedman proposed that the Tribe sell an 80%

18  interest of its undivided 50% interest in the Scanvik property to 4330 Watt for $4.2 million.

19      121.    The proposed "sale" would be consummated through a down payment to the

20  Tribe by 4330 Watt of $265,000, along with a promissory note for $3.935 million at 5% interest

21  to be paid in monthly installments of $16,395.83 through October 31, 2005. Friedman also

22  proposed to Dickstein and/or Opper that, contemporaneous with the "sale," 4330 Watt would

23  lease back to the Tribe the very same undeveloped land the Tribe had just "sold." The monthly

24  "rent" was $16,395.83, the exact same amount due each month under the 4330 Watt promissory

25  note. The "lease" terminated on October 31, 2005, the same date as the maturity date for 4330

26  Watt's promissory note.

27      122.    To allow the Tribe to restore its ownership in its portion of the Scanvik property,

28  4330 Watt also "gave" the Tribe an option to "repurchase" its interest in the Scanvik property

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

-31-

1    from 4330 Watt for $4.2 million—the same amount for which the Tribe had earlier "sold" the

2    property to 4330 Watt. The option expired on October 31, 2005.

3           123.    The effect of these two transactions—the "sale" and the "lease back" with an

4    option to purchase—was that the two transactions offset each other and there would be no

5    financial benefit or substance to the transactions except that they allowed Friedman, through

6    4330 Watt, to "park" the proceeds from the first sale in a tax-deferred exchange within the time

7    deadlines required by the Internal Revenue Code.

8           124.    Dickstein and/or Opper recommended to Chairperson Lorenzo that the Tribe

9    enter the transactions, through Rumsey GPF, notwithstanding the fact that the Tribe secured no

10   economic benefit from doing so.

11          125.    On February 5, 2004, at the behest of Dickstein and/or Opper and in reliance

12   upon their advice and recommendation, Chairperson Paula Lorenzo and Treasurer Bessey

13   Villalobos signed documents effectuating the "sale" and "lease back." Neither Dickstein nor

14   Opper explained to Chairperson Lorenzo and Treasurer Villalobos the nature of the transaction,

15   or significance or effect of the documents. Neither Chairperson Lorenzo nor Treasurer

16   Villalobos understood the transaction or the legal consequences of the documents they signed.

17   Moreover, neither Dickstein nor Opper advised Chairperson Lorenzo and Treasurer Villalobos

18   that they lacked authority to take such actions without presentation to the Tribal Council.

19          126.    At the time of the transfer of the "sale" to 4330 Watt, the fair market value of the

20   land transferred far exceeded the "sale" price of $4.2 million. Dickstein, Opper and Friedman

21   all knew of the discrepancy in the property's value, which continued to increase exponentially

22   after the "sale." The option was not exercised and expired on October 31, 2005. Opper,

23   Dickstein, Zerbi, and Dickstein & Zerbi failed to notify the Tribe of the need to timely exercise

24   the option to protect its property interests.

25          127.    The Tribe did not discover these acts and omissions until September 2006. After

26   that discovery, and when Tribe sought to regain its position in the property, it was told it had lost

27   the interest by failing to timely exercise the option. As a result of acts and omissions of

28   Dickstein, Zerbi, Dickstein & Zerbi and/or Opper, the Tribe lost millions of dollars.

525 MARKET STREET, 26ᵗʰ FLOOR
SAN FRANCISCO, CALIF. A 94105-2708
(415) 88

O.    **Dickstein's and Opper's Control and Use of Tribal Assets.**

128.   The Tribe owns fractional interests in a lease of aircraft through NetJets. Pursuant to the Tribe's policies, the Tribal Council permitted Tribal members and Dickstein and Opper to use the NetJets aircraft for personal trips for 10 hours per year as long as they reimbursed the Tribe for half the trip's hourly rate. Dickstein and Opper used the NetJets aircraft for personal travel beyond the 10-hour annual limit and failed to completely reimburse the Tribe for the amounts owed from such travel. Dickstein in particular used the Tribe's airplanes for personal trips to a home in Big Sur, a vacation to the South of France, and "casino retreats" that involved attendance at grand prix racing events in Monte Carlo and Montreal. According to the Tribe's calculations, Dickstein owes the Tribe over $1.2 million in un-reimbursed personal travel expenses. Opper owes the Tribe over $330,000.

129.   The Tribe leases a loft at 1530 J Street, Sacramento, California (the "Loft"). The Loft is in the same building in which Dickstein, Opper and Friedman have offices. Friedman or partnerships involving Friedman own and manage the building.

130.   Dickstein, Zerbi, and Dickstein & Zerbi controlled access to the NetJets aircraft and the Loft. All reservations for the NetJets (including those for Tribal members' use) had to be made through Dickstein's office. Similarly, Dickstein & Zerbi kept the Loft keys and if someone wanted to use the Loft, they had to reserve it through Dickstein & Zerbi. Dickstein & Zerbi paid all NetJets invoices and all Loft expenses through its trust account.

P.    **Dickstein & Merin's And Dickstein & Zerbi's Trust Account.**

131.   Dickstein & Merin and Dickstein & Zerbi each maintained an attorney-client trust account into which client funds were deposited for the purpose of paying necessary client expenses.

132.   Dickstein secured payments for the trust account from the Casino, without notifying the Tribe of such payments. Over time, the Casino transferred over $9 million to Dickstein for the trust account.

133.   Dickstein & Merin and Dickstein & Zerbi never fully advised the Tribe how the trust account funds were being expended, and the Tribe never approved the expenses.

525 MARKET STREET, 26⁵ FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

134.    Dickstein, Dickstein & Merin and Dickstein & Zerbi used the trust account as a way to secure control over the Tribe's funds and, in certain instances, to use them for Dickstein's personal benefit, or for other unauthorized purposes, without the Tribe's knowledge. In addition to the improper use of client funds, the Tribe has discovered numerous problems with the accounting and reconciliations performed on the Tribe's trust account. Such problems include the Tribe's funds being used to pay other Dickstein clients' invoices, the double payment of invoices, lack of account reconciliation from one period to the next, overpayment of invoices and undetermined uses of funds.

135.    Despite the Tribe's requests, the Attorney Defendants have failed to render a proper accounting.

136.    A reasonable, competent, diligent, and ethical General Counsel would and should (1) maintain detailed and complete records of all client funds coming into the attorney's possession, so as to show the date and amount and source of all funds received on behalf of the client, the date, amount, payee and purpose of each disbursement made on behalf of the client, the current balance, the bank statements, cancelled checks, and monthly reconciliation (balancing) of the trust account; (2) preserve such records for a period of not less than five years after final appropriate distribution of such funds; (3) promptly pay to the client any funds the client is entitled to receive at the end of the representation; and (4) render an appropriate accounting to the client. The Attorney Defendants failed to fulfill these duties here.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Attorney Defendants)

137.    The Tribe incorporates by reference as though fully set forth herein paragraphs 1 through 136 of this Complaint.

138.    The Tribe entered a series of written and later oral agreements with the Attorney Defendants under which the Attorney Defendants agreed to serve as the Tribe's General Counsel and, in that capacity, provide the Tribe with all necessary legal services in connection with the Tribe's governmental and business affairs. Implied in these agreements was the promise by the

-34-
COMPLAINT

Attorney Defendants that they would provide these necessary legal services with reasonable
care, skill and diligence. These agreements were entered into in this County and were to be
performed in this County.

139.    In committing the various acts and omissions alleged above, the Attorney
Defendants breached their agreements by failing to provide necessary legal services in
connection with the Tribe's governmental and business affairs with reasonable care, skill and
diligence. For example, the Attorney Defendants led the Tribe's governing body to believe they
were protecting the Tribe's interests in all of its governmental and business affairs, including the
various business deals in which the Tribe invested. It was only after the Attorney Defendants
were terminated, and after the Tribe's new legal counsel sought documents related to the
investments, that the Attorney Defendants informed the Tribe they were not, in fact,
representing the Tribe in the business deals in which it became involved. The Attorney
Defendants breached their contractual obligations by, among other things, failing to notify the
Tribe they were not representing its interests in those transactions and in addition, by failing to
advise the Tribe to seek and secure the advice and guidance of other counsel who could provide
competent and objective guidance. By doing so, the Tribe was left unrepresented by legal
counsel in the various transactions and the contract terms disproportionately favoring other
parties to the transactions show it.

140.    In addition, the Attorney Defendants further breached their agreements with the
Tribe by, among other things, (1) failing to disclose to the Tribe, and provide adequate advice
about, arrangements through which the Opper Defendants and Friedman Defendants secured
side payments or an interest in the Tribe's investments without the Tribe's knowledge and
consent; (2) unilaterally negotiating with the Opper Defendants the structure and amount of his
compensation without Tribal Council approval or involvement, and thereafter, failing to
adequately substantiate the basis for the invoices that the Opper Defendants submitted for
payment; (3) failing to submit the Opper Defendants' invoices to the Tribe for review and
payment; (4) failing to disclose their own conflicts of interest and/or personal interests that were
adverse to the Tribe's interests; (5) failing to adequately advise their Tribal client about Tribal

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF.
(415) 882-    941052708

-35-

1   law, and the scope of a Tribal official's authority under the Tribe's Constitution and Bylaws, and

2   to the contrary, by affirmatively inducing the Tribe's former Chairperson and/or others to take

3   actions that circumvented or violated Tribal law; (6) recommending to the Tribe that it engage in

4   the "parking" transaction with 4330 Watt; and (7) failing to notify the Tribe of the need to

5   timely exercise the option to reacquire the property that it sold to 4330 Watt in the "parking"

6   transaction.

7       141.    The Attorney Defendants' breach of the agreements, as herein alleged,

8   proximately caused monetary injury to the Tribe in an amount to be established at trial.

9       WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

10   ### SECOND CAUSE OF ACTION

11   ### BREACH OF CONTRACT

12   **(Against Opper Defendants)**

13      142.    The Tribe incorporates by reference as though fully set forth herein paragraphs 1

14   through 141 of this Complaint.

15      143.    The Opper Defendants and the Tribe also entered a series of oral agreements

16   through which the Opper Defendants were paid, in part, to manage various of the Tribe's assets

17   and to provide the Tribe advice concerning those assets. Implicit in these agreements was the

18   Opper Defendants' commitment to act honestly and exclusively in the Tribe's interests. These

19   agreements were entered into in this County and were performed in this County.

20      144.    In committing the acts and omissions alleged above, the Opper Defendants

21   breached these agreements by, among other actions, (1) seeking and securing payment for

22   "managing" assets they did not actually manage; (2) submitting invoices with inflated asset

23   values; (3) obtaining multiple payments for the management of a single asset; (4) recommending

24   that the Tribe invest in Wood River; (5) recommending that the Tribe engage in the "parking"

25   transaction with 4330 Watt; and (6) failing to timely notify the Tribe of the requirement that it

26   timely exercise the option to reacquire the property that it sold to 4330 Watt in the "parking"

27   transaction.

28

1    145.    As a proximate result of the Opper Defendants' breach, the Tribe has been

2    damaged in an amount to be proven at trial.

3        WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

4                          **THIRD CAUSE OF ACTION**

5                              **NEGLIGENCE**

6                        **(Against Attorney Defendants)**

7        146.    The Tribe incorporates by reference as though fully set forth herein paragraphs 1

8    through 145 of this Complaint.

9        147.    In committing the acts and omissions alleged above, the Attorney Defendants

10    unreasonably and negligently breached the standards of care, skill and diligence exercised by

11    attorneys who undertake to advise or represent clients in similar circumstances.

12        148.    Specifically, as described above, the Attorney Defendants failed to disclose to the

13    Tribe, and provide adequate advice about, arrangements through which the Opper Defendants

14    (and sometimes Friedman Defendants) secured side payments or an interest in the Tribe's

15    investments. The Attorney Defendants knew about these arrangements, and with full knowledge

16    that only the Tribe's governing body had the power to approve such payments from its

17    investments, the Attorney Defendants knew or should have known that such were never

18    disclosed to and approved by the Tribal Council. Some of the financial arrangements

19    contradicted the explicit terms of the deal documents and/or the express representations made by

20    the Attorney Defendants and/or others to the Tribal Council. A reasonable, competent, loyal,

21    diligent, and ethical General Counsel would and should have disclosed the adverse conflicts of

22    interest due to Opper's and Friedman's undisclosed financial interests in the various

23    transactions; explained the Tribe's rights given Opper's and Friedman's fiduciary role and duties

24    to the Tribe; explained how Opper's self-dealing might adversely affect Opper's role as an

25    investment advisor for the Tribe; ensured the Tribal Council actually knew of, and approved,

26    such arrangements and conflicts, and further ensured that such approval was properly

27    documented and recorded. It is fundamental that a "lawyer working on a transaction has a duty

28    as an agent to disclose to his [principal] 'information relevant to matters within his province and

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 88

-37-

1  of which he should know the principal would want to know.' " *Hagood v. Sonoma County*

2  *Water Agency*, 81 F.3d 1465, 1480 (9th Cir. 1996), (Kleinfeld, J. concurring) quoting Warren A.

3  Seavey, Law of Agency§143 (1964).

4      149.   The Attorney Defendants also breached their duties to the Tribe by unilaterally

5  negotiating with the Opper Defendants concerning the amount of the Opper Defendants'

6  compensation without Tribal Council approval or involvement. They, in fact, failed to disclose

7  to the Tribe the amount or method by which the Opper Defendants were being paid, including

8  the fact that they were being paid to "manage" assets they did not actually manage, pursuant to

9  an "asset management" fee structure Dickstein and Opper devised without Tribal Council

10  knowledge or approval. The Attorney Defendants never submitted the Opper Defendants' often-

11  inflated "asset management" invoices to the Tribe for review and approval, but rather, simply

12  directed an outside accountant to pay them. The Attorney Defendants also knew or should have

13  known that the Opper Defendants sometimes received payment from the same investment in

14  more than one way, and as to at least one investment, "triple dipped." The Attorney Defendants

15  knew or should have known that all of these matters had to be approved by the Tribal Council

16  and that such had never occurred. A reasonable, competent, loyal, diligent, and ethical General

17  Counsel would and should have ensured the Tribe's governing body was fully aware of, and

18  agreed to, the method of and basis for compensating the Opper Defendants, and ensured that all

19  invoices the Opper Defendants submitted were properly supported and submitted to the Tribe for

20  approval prior to payment; and that the Tribal Council's approval of the compensation structure

21  and payments to the Opper Defendants was properly documented in the Tribe's books and

22  records.

23      150.   The Attorney Defendants also failed to faithfully and zealously represent the

24  interests of their client in the negotiation of the above-detailed investments, as reflected by the

25  one-sided terms of deals in which the Tribe assumed a disproportionate degree of the risk

26  relative to the other investors, and received a lower reward, to the benefit of the other (primarily

27  non-Tribal) investors. A reasonable, competent, loyal, diligent, and ethical General Counsel

28  should and would have zealously advised and represented the Tribe's interests, protecting its

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

1   interests visà-vis other parties to the transactions by negotiating more favorable terms to

2   compensate it for assuming the most risk; ensuring the Tribal Council was fully aware and

3   approved the comparative terms that directly affected the Tribe's economic interests; and further

4   ensuring that any knowledge and approval of such terms by the Tribal Council was properly

5   recorded.

6       151.   The Attorney Defendants also breached their duties to the Tribe by failing to

7   disclose their own conflicts of interest.  Specifically, the Attorney Defendants represented the

8   Tribe in several investments while at the same time, representing other Tribal clients.  In one

9   investment of which the Tribe is aware, the Attorney Defendants themselves stood to gain

10   financially, as they were entitled to receive fees from the investment.  A reasonable, competent,

11   loyal, diligent, and ethical General Counsel would and should have disclosed the conflicts of

12   interest in the investments in which he or she represented the Tribe; explained the legal and

13   practical significance of such conflicts, including how they might taint the lawyer's objectivity

14   and undermined his or her ability to render objective and competent advice and

15   recommendation; recommended that the Tribe obtain independent legal advice; and ensured any

16   Tribal Council decision whether to obtain legal advice and/or to continue with the Attorney

17   Defendants' conflicted representation was properly documented.

18       152.   In addition, the Attorney Defendants breached their duties to the Tribe by failing

19   to fully account for the funds paid to them for use on the Tribe's behalf and which they held in

20   trust for the Tribe's benefit.  A reasonable, competent, loyal, diligent, and ethical General

21   Counsel would and should have maintained a thorough and contemporaneous accounting of the

22   use and expenditure of all funds paid to them and which they held in trust for use on the Tribe's

23   behalf.

24       153.   Furthermore, the Attorney Defendants breached their duties of care to the Tribe

25   first by recommending that the Tribe engage in the "parking" transaction with 4330 Watt, which

26   presented no economic benefit to the Tribe whatsoever and was undertaken solely to provide a

27   Friedman-controlled entity a tax advantage.  They again breached their duties by thereafter

28

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882

1   failing to timely notify the Tribe of the requirement that it exercise its option to repurchase the

2   portion of the Scanvik property that it "sold" to 4330 Watt in the "parking" transaction.

3        154.   In addition, the Attorney Defendants were negligent by routinely circumventing

4   Tribal law when inducing Tribal officials to take certain actions that had not been approved by

5   the Tribe's governing body. To that end, they failed to adequately advise their Tribal client

6   about Tribal law, and the extent to which it limited the actions of Tribal officials without proper

7   Tribal Council authorization.

8        155.   The negligent acts and omissions of the Attorney Defendants, as alleged above,

9   were a substantial factor in causing the Tribe monetary losses and damages in an amount to be

10   established at trial.

11        WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

12                **FOURTH CAUSE OF ACTION**

13                **BREACH OF FIDUCIARY DUTY**

14   **(Against Attorney Defendants; Opper Defendants; Friedman Defendants)**

15        156.   The Tribe incorporates by reference as though fully set forth herein paragraphs 1

16   through 155 of this Complaint.

17        157.   The Attorney Defendants, as lawyers for the Tribe, owed fiduciary duties to the

18   Tribe. The Opper Defendants, acting as the Tribe's agents, also were fiduciaries who owed the

19   Tribe fiduciary duties. As managers of certain investments in which the Tribe had invested, the

20   Friedman Defendants also owed the Tribe fiduciary duties in connection with those investments.

21        158.   In committing the acts and omissions alleged above, the Attorney Defendants, the

22   Opper Defendants and the Friedman Defendants breached their respective fiduciary duties to the

23   Tribe.

24        159.   Specifically, the Attorney Defendants breached their fiduciary duties to the Tribe

25   by, among other things, (1) failing to disclose to the Tribe, and provide adequate advice about,

26   arrangements through which the Opper Defendants and Friedman Defendants secured side

27   payments or an interest in the Tribe's investments without the Tribe's knowledge and consent;

28   (2) unilaterally negotiating with the Opper Defendants the structure and amount of his

525 MARKET STREET, 26TH FLOOR<br>SAN FRANCISCO, CALIFORNIA 94105-2708<br>(415) 882-

1    compensation without Tribal Council approval or involvement, and thereafter, failing to

2    adequately substantiate the basis for the invoices that the Opper Defendants submitted for

3    payment; (3) failing to submit the Opper Defendants' invoices to the Tribe for review and

4    payment, and further failing to fully advise the Tribe as to the regulatory implications associated

5    with Opper's activities, and the content and structure of those contracts given the nature of those

6    activities; (4) failing to disclose their own conflicts of interest and/or personal interests that

7    were adverse to the Tribe's interests; (5) failing to adequately advise their Tribal client about

8    Tribal law, and the scope of a Tribal official's authority under the Tribe's Constitution and

9    Bylaws, and to the contrary, by affirmatively inducing the Tribe's former Chairperson to take

10   actions that circumvented or violated Tribal law; (6) first recommending to the Tribe that it

11   engage in the "parking" transaction with 4330 Watt; (7) failing to timely notify the Tribe of the

12   requirement that it timely exercise the option to reacquire the property that it sold to 4330 Watt

13   in the "parking" transaction; (8) failing to properly account for all funds held in trust on the

14   Tribe's behalf; and (9) failing to fully reimburse the Tribe for personal use of the airplanes to

15   which the Tribe had rights of use.

16        160.    The Opper Defendants breached their fiduciary duties to the Tribe by, among

17   other actions, (1) seeking and securing payment for "managing" assets they did not actually

18   manage; (2) submitting invoices with inflated asset values; (3) obtaining multiple payments for

19   managing the same asset; (4) receiving various forms of undisclosed compensation, profit and

20   equity interests and/or commissions from third parties; (5) recommending the Tribe invest in

21   Wood River; (6) recommending the Tribe engage in the "parking" transaction with 4330 Watt;

22   (7) failing to notify the Tribe of the requirement that it timely exercise the option to

23   "repurchase" the property that it "sold" to 4330 Watt in the "parking" transaction; and (8) failing

24   to fully reimburse the Tribe for their personal use of the aircraft to which the Tribe had rights of

25   use.

26        161.    The Friedman Defendants breached their fiduciary duties to the Tribe by, among

27   other actions, (1) distributing portions of the Tribe's profit interests in GPF and GPF IV to

28   Opper in violation of the Executed GPF Operating Agreements and the GPF IV Operating

1  Agreement; (2) substituting new operating agreements for GPF in place of the Executed GPF

2  Operating Agreements; (3) receiving a portion of the Special Distributions otherwise payable to

3  the Tribe.

4    162.   The breaches of their respective fiduciary duties by the Attorney Defendants, the

5  Opper Defendants, and the Friedman Defendants, as herein alleged, were a substantial factor in

6  causing the Tribe monetary losses and damages in an amount to be established at trial.  All

7  defendants should be ordered to disgorge to the Tribe all sums they received while acting in

8  breach of their fiduciary and ethical duties.

9    163.   In breaching their fiduciary duties as herein above alleged, Dickstein, Dickstein

10  & Zerbi, Dickstein & Merin, and the Opper Defendants acted with oppression, fraud and malice

11  towards the Tribe, and the Tribe is entitled to recover punitive damages, in an amount to be

12  determined at trial.

13    WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

14  ## FIFTH CAUSE OF ACTION

15  ## AIDING AND ABETTING AND

16  ## PARTICIPATING IN BREACHES OF FIDUCIARY DUTY

17  **(Against Dickstein, Dickstein & Zerbi, Dickstein & Merin; Opper Defendants)**

18    164.   The Tribe incorporates by reference as though fully set forth herein paragraphs 1

19  through 163 of this Complaint.

20    165.   Dickstein, Dickstein & Zerbi and Dickstein & Merin owed the Tribe fiduciary

21  duties.  The Opper Defendants, acting as the Tribe's agents, also owed fiduciary duties to the

22  Tribe.  As managers of GPF and GPF IV, the Friedman Defendants also were fiduciaries with

23  respect to those investments and owed fiduciary duties to the Tribe.

24    166.   In committing the acts and omissions alleged above, Dickstein and his law firms,

25  as well as the Opper Defendants, all were aware of, participated in, substantially aided and

26  abetted and/or substantially assisted each other's breaches of their respective fiduciary duties to

27  the Tribe.

28

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF., CA 94105-2708
(415) 882

-42-

1    167.   In committing the acts and omissions alleged above, these defendants also were

2  aware of, participated in, substantially aided and abetted, and/or substantially aided and induced

3  the former Chairperson to act outside the scope of her authority under Tribal law and the

4  Friedman Defendants to breach their respective fiduciary duties to the Tribe.

5    168.   Dickstein's, his law firms', and the Opper Defendants' aiding and abetting of the

6  various breaches of fiduciary duties as alleged herein were a substantial factor in causing the

7  Tribe's monetary losses and damages in an amount to be established at trial.

8    169.   In performing these acts and omissions, Dickstein, Dickstein & Zerbi, Dickstein

9  & Merin, and Opper Defendants acted with oppression, fraud and malice towards the Tribe and

10  the Tribe is entitled to recover punitive damages, in an amount to be determined at trial.

11    WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

12                    **SIXTH CAUSE OF ACTION**

13                    **FRAUD/CONCEALMENT**

14    **(Against Dickstein, Dickstein & Merin, Dickstein & Zerbi; Opper Defendants)**

15    170.   The Tribe incorporates by reference as though fully set forth herein paragraphs 1

16  through 169 of this Complaint.

17    171.   Dickstein, Dickstein & Merin and Dickstein & Zerbi owed the Tribe fiduciary

18  duties. The Opper Defendants, acting as the Tribe's agents, also owed fiduciary duties to the

19  Tribe.

20    172.   Dickstein, Dickstein & Merin and Dickstein & Zerbi committed the above-

21  detailed acts and omissions with the intent to defraud the Tribe and deprive it of money and

22  other property interests to which the Tribe was entitled. In particular, Dickstein and his law

23  firms devised a compensation scheme and directed payment to the Opper Defendants without

24  obtaining the Tribal Council's authorization for either the method or form of compensation and

25  the payments made thereunder. Dickstein, Dickstein & Zerbi and Dickstein & Merin

26  affirmatively concealed the existence and content of such inflated invoices from the Tribal

27  Council, never submitting them to the Tribe for review and approval and instead simply

28  directing an outside accountant to pay them with Tribal funds.

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 8_  _0

173.    In addition, Dickstein, Dickstein & Zerbi and Dickstein & Merin concealed from the Tribal Council the existence of distributions from the Tribe's GPF investment to Opper, even though they knew the Tribal Council was told and understood GPF was "a 50-50 venture between the Rumsey Tribe and the Friedmans." Dickstein, Dickstein & Zerbi and Dickstein & Merin further facilitated this fraud on the Tribe by preparing letters purporting to assign a portion of the Tribe's interests in GPF without ever informing the Tribal Council or securing its approval. Furthermore, Dickstein participated in the substitution of a new GPF operating agreement for the Executed GPF Operating Agreements.  Dickstein and his law firms did so, knowing the Tribal Council had no knowledge of, and never approved, the swapped agreement, which inured to Friedman's benefit and to the Tribe's detriment.

174.    Later, Dickstein, Dickstein & Zerbi, and Dickstein & Merin concealed from the Tribal Council the fact that Opper was receiving distributions from GPF IV, even though he knew the Tribal Council had understood Opper was not a participant in GPF IV as the express terms of the agreements stated.  Furthermore, Dickstein and his law firms concealed from the Tribal Council the existence of contract terms that provided the Opper Defendants with compensation, profit interests and/or equity interests in a series of other investments—Lytton, LASCAL, Evergreen, Zamora, Knights Landing, and Vectors.

175.    In addition, Dickstein and his law firms concealed from the Tribe the extent to which Dickstein used, for his own personal purposes, the airplanes to which the Tribe had rights of use, and the fact that he owed (and still owes) the Tribe reimbursement for such flights.

176.    The Opper Defendants committed the above-detailed acts and omissions with the intent to defraud the Tribe and deprive it of money and other property interests to which the Tribe was entitled.  In particular, the Opper Defendants committed fraud by submitting to Dickstein for payment asset management fee statements that (1) contained inflated values for certain of the listed assets; (2) listed assets that they did not actually "manage"; and (3) listed assets for which they had already been compensated.  They concealed the existence and content of these asset management fee statements from the Tribe, submitting them only to Dickstein.

177.   Additionally, Opper committed fraud by intentionally misrepresenting to the Tribal Council that GPF was a "50-50 venture between the Rumsey Tribe and the Friedmans," while concealing from the Tribal Council the fact that Opper intended to secure an interest in the GPF investment at the Tribe's expense. Thereafter, Opper concealed from the Tribal Council the fact that he had requested and obtained letters purporting to assign to him a portion of the Tribe's interest in GPF and GPF IV, and was receiving distributions from those entities. In addition, he concealed from the Tribal Council that, at Friedman's direction, Opper participated in the substitution of a new GPF operating agreement for the Executed GPF Operating Agreements. He did so, knowing the Tribal Council had no knowledge of, and never approved, the swapped agreement, which inured to Friedman's benefit and to the Tribe's detriment.

178.   In addition, Opper and Opper Development LLC committed fraud by concealing from the Tribal Council the existence of contract terms that provided them compensation, profit interests and/or equity interests in a series of investments—Lytton, LASCAL, Evergreen, Zamora, Knights Landing, and Vectors. The details of the concealed compensation, profit interests and/or equity interests for the respective investments are detailed above.

179.   Opper also concealed from the Tribal Council the extent to which he used, for his own personal purposes, the airplanes to which the Tribe had rights of use, and the fact that he owed (and still owes) the Tribe reimbursement for such flights.

180.   The Tribal Council reasonably relied upon the statements, acts and omissions of Dickstein, Dickstein & Merin, Dickstein & Zerbi, and the Opper Defendants, as detailed above, to its detriment.

181.   When these defendants made the false and fraudulent statements to the Tribal Council as detailed above, or concealed the actual facts from the Tribal Council, the Tribal Council was unaware of the true facts that defendants had misrepresented and/or concealed. If the Tribal Council had known the truth, as well as the undisclosed facts, it would not have approved the actions that were taken to its detriment and that were the subject of the misrepresentations or the concealment.

182.    The fraud and concealment of Dickstein, Dickstein & Merin, Dickstein & Zerbi, and the Opper Defendants, as alleged above, was a substantial factor in causing the Tribe's monetary losses and damages in an amount to be established at trial.

183.    In committing fraud and concealment, as herein above alleged, Dickstein, Dickstein & Merin, Dickstein & Zerbi, and the Opper Defendants acted with oppression, fraud and malice towards the Tribe, and the Tribe is entitled to recover punitive damages, in an amount to be determined at trial.

WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

## CONSTRUCTIVE FRAUD

### (Against Dickstein, Dickstein & Merin,

### Dickstein & Zerbi; Opper Defendants; Friedman Defendants)

184.    The Tribe incorporates by reference as though fully set forth herein paragraphs 1 through 183 of this Complaint.

185.    Dickstein, Dickstein & Zerbi and Dickstein & Merin owed the Tribe fiduciary duties. The Opper Defendants, acting as the Tribe's agents, also were fiduciaries who owed fiduciary duties to the Tribe. As managers of GPF and GPF IV, the Friedman Defendants also were fiduciaries for those investments and owed fiduciary duties to the Tribe. Given their respective roles as fiduciaries to the Tribe, each of the above defendants possessed a confidential relationship with the Tribe and bore a heightened duty to the Tribe to communicate all facts material to the relationship.

186.    Dickstein, Dickstein & Zerbi and Dickstein & Merin breached their respective duties to the Tribe by failing to disclose to the Tribal Council facts material to the relationship, including, but not limited to, the manner, method and amount by which the Opper Defendants were being paid; the existence and content of inflated invoices the Opper Defendants submitted; Opper's receipt of distributions, profit interests and/or equity interests in the many investments detailed above; the existence and significance of conflicts of interest pertaining to Dickstein's and his law firms' representation of the Tribe in various investments; and the extent of

525 MARKET STREET, 26ᵗʰ FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

1  Dickstein's personal use of Tribal assets and the fact that he owed the Tribe reimbursement for

2  such use.

3      187.   The Opper Defendants breached their respective duties to the Tribe by failing to

4  disclose to the Tribal Council facts material to the relationship, including, but not limited to, the

5  manner, method and amount by which the Opper Defendants were being paid; the existence and

6  content of the Opper Defendants' invoices; Opper's receipt of distributions, profit interests

7  and/or equity interests in the many investments detailed above; and the extent of Opper's

8  personal use of Tribal assets and the fact he owed the Tribe reimbursement for such use. The

9  truth was unknown by the Tribe, and the Tribe reasonably relied upon the material statements

10  and omissions of its trusted advisors.

11      188.   The Friedman Defendants breached their respective duties to the Tribe by failing

12  to disclose to the Tribal Council facts material to the relationship, including, but not limited to,

13  (1) Opper's receipt of distributions from GPF and GPF IV, notwithstanding the express terms of

14  the relevant operating agreements and Friedman's prior representation to the Tribal Council that

15  GPF was "a 50-50 venture between the Rumsey Tribe and the Friedmans"; and (2) failure to

16  disclose to the Tribal Council the existence of a new operating agreement that inured to his and

17  Illinois Property Fund's benefit and to the Tribe's detriment, and that was inconsistent with

18  Friedman's prior representation to the Tribal Council as well as the express terms of the

19  Executed GPF Operating Agreements.

20      189.   The true facts were unknown by the Tribe, and the Tribe reasonably relied upon

21  the material statements and omissions of its fiduciaries. It did so to its detriment. If the Tribe

22  had known the truth, as well as the undisclosed facts, it would not have approved the actions that

23  were taken to its detriment and that were the subject of the misrepresentations and/or the

24  undisclosed facts.

25      190.   The above acts and omissions of Dickstein, Dickstein & Merin, Dickstein &

26  Zerbi, the Opper Defendants, and the Friedman Defendants, as alleged above, was a substantial

27  factor in causing the Tribe monetary losses and damages in an amount to be established at trial.

28      WHEREFORE, the Tribe prays for judgment as hereinafter set forth.

523 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-

## EIGHTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

**(Against Attorney Defendants, Opper Defendants, Friedman Defendants)**

191.     The Tribe incorporates by reference as though fully set forth herein paragraphs 1 through 190 of this Complaint.

192.   As General Counsel to the Tribe, the Attorney Defendants had a duty to advise the Tribe in a complete, thorough and honest manner. As agents and fiduciaries of the Tribe, the Opper Defendants had an equal duty to advise the Tribe in a complete, thorough and honest manner. As managers of GPF and GPF IV, the Friedman Defendants also owed the Tribe the duty to communicate in a complete, thorough and honest manner with respect to those investments.

193.     In making the above-detailed representations to the Tribal Council, and in failing to advise the Tribal Council of all relevant facts as alleged above, the Attorney Defendants, the Opper Defendants and the Friedman Defendants breached their respective duties to the Tribe.

194.   The Tribal Council reasonably relied upon the statements, acts, omissions, advice and counsel of the Attorney Defendants, the Opper Defendants and Friedman Defendants to the Tribe's detriment as alleged above. If the Tribal Council had known the truth, as well as the undisclosed facts, it would not have approved the actions that were taken to its detriment and that were the subject of the negligent misrepresentations or the concealment

195.   The negligent misrepresentation of the Attorney Defendants, the Opper Defendants, and the Friedman Defendants, as alleged above, was a substantial factor in causing the Tribe's monetary losses and damages in an amount to be established at trial.

WHEREFORE, The Tribe prays for judgment as hereinafter set forth.

## NINTH CAUSE OF ACTION

## CONVERSION

**(Against Attorney Defendants, Opper Defendants, Friedman Defendants)**

196.   The Tribe incorporates by reference as though fully set forth herein paragraphs 1 through 195 of this Complaint.

525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIF. 94105-2708
(415) 882